**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDSON W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 2626** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Edson W. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court now grants the Commissioner's motion.

## BACKGROUND

Plaintiff applied for DIB and SSI on November 20, 2014 and December 1, 2014, respectively, alleging in both applications that he became disabled on September 9, 2013 due to migraines, high blood pressure, sinus issues, and being shot in the head twice in 1992. (R. 320-30, 356). Born in 1971, Plaintiff was 43 years old at the time of his applications, making him a younger person. (R. 320, 329); 20 C.F.R. § 404.1563(c); 20

C.F.R. § 416.963(c). He has a GED, lives with his mother, and briefly worked as a fast food cook and forklift operator between April 2008 and August 2010. (R. 123, 357). Plaintiff took a job as a construction carpenter in September 2010 but stopped working on September 30, 2013 because his headaches purportedly became intolerable. (R. 96, 98, 356, 357).

The Social Security Administration denied Plaintiff's applications initially on June 26, 2015, and again upon reconsideration on November 24, 2015. (R. 146-208). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Victoria A. Ferrer (the "ALJ") on October 10, 2017. (R. 79). The ALJ heard testimony from Plaintiff, who was represented by counsel, from Plaintiff's mother, and from vocational expert ("VE") Gary P. Wilhelm. (R. 81-145). After the hearing, Plaintiff submitted a variety of additional treatment records. As a result, the ALJ asked neurologist Paula Warren, M.D., to answer some interrogatories regarding Plaintiff's functioning. (R. 14, 36, 432). Dr. Warren provided her Medical Interrogatory on January 10, 2018, and the ALJ then held a supplemental hearing on May 2, 2018. (R. 34, 880-82). The ALJ heard additional testimony from Plaintiff, who was once again represented by counsel, and from a medical expert William L. Debolt (the "ME") and VE Richard T. Fisher.[1] (R. 36-57).

On May 29, 2018, the ALJ found that Plaintiff's headaches, encephalomalacia, hypertension, and adjustment disorder are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[2] (R. 17-20). After reviewing the evidence, the ALJ concluded that Plaintiff is not disabled

---

[1]     Dr. Debolt testified at the supplemental hearing because Dr. Warren was unavailable. (R. 15).

[2]     Encephalomalacia refers to a softening of brain tissue. (https://medical-dictionary.thefreedictionary.com/encephalomalacia, last visited April 7, 2021).

because he retains the residual functional capacity ("RFC") to perform a significant number of medium jobs available in the national economy, including kitchen helper, counter supply, and linen room attendant. (R. 20-27). The Appeals Council denied his request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that the ALJ: (1) failed to properly assess the limiting effects of his headaches, including his own subjective statements and the testimony from his mother regarding his symptoms; (2) erred in determining his mental RFC; and (3) failed to account for his knee pain in the RFC. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence and there is no basis to reverse or remand the case.

**DISCUSSION**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's

determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.  Five-Step Inquiry

To recover DIB or SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act.[3]  *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).  A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must

---

[3]  Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C. Analysis

### 1. Headaches

Plaintiff argues that the case must be reversed or remanded because the ALJ did not properly consider the nature and severity of his headaches. He begins by identifying a perceived inconsistency in the ALJ's analysis of the headache evidence. ME Debolt testified at the May 2, 2018 hearing that he did not believe Plaintiff was suffering from any severe impairments at all, including headaches. (R. 44). The ALJ gave this opinion only some weight, explaining that she "elected to view the evidence in the light most favorable to [Plaintiff] and find instead that [Plaintiff] does have severe impairments that cause . . . limitations." (R. 23). Plaintiff objects that even though the ALJ said she was viewing the evidence in his favor, she rejected many of his statements regarding the limiting effects of his headaches. (Doc. 14, at 5; Doc. 26, at 1). According to Plaintiff, this reflects a "deep logical flaw" that constitutes reversible error. (*Id.*) (citing *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004)). The Court disagrees.

It is clear from the statement in question and the decision as a whole that the ALJ viewed the evidence in Plaintiff's favor with regard to the existence of a severe impairment, not as to his testimony generally. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."). There is nothing improper or inconsistent about concluding that Plaintiff's headaches constitute a severe impairment (in contrast to ME Debolt's opinion) while also rejecting Plaintiff's statements regarding the limiting effects of those headaches. *Cf. Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1029 (N.D. Ill. 2009) (ALJ erred by stating twice in the decision that the claimant's statements regarding the limiting effects of her symptoms were affirmatively "credible," then failing to explain why she rejected several of those statements).

Plaintiff insists that the ALJ still erred in failing to accept his testimony that he needs to "isolate himself" and "lie down several days per week" as a result of headache pain. (Doc. 14, at 6). Plaintiff claims this error is not harmless because the VE testified that an individual would not be able to sustain full-time work if he were off-task more than 15% of the workday. (R. 143). The regulations describe a two-step process for evaluating a claimant's own description of his impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities,

h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Plaintiff testified that he has constant pain from headaches that is exacerbated by moving or standing up too quickly. (R. 100). Sometimes the pain is bearable, but two or three times a day he experiences sudden unbearable pain lasting 20 seconds. (R. 105). When that happens, he is briefly rendered non-functional, then takes his medication and goes to lie down in a quiet place. (R. 105, 107, 119-20). Headache triggers include moving too fast, reading small print, bright light/sunlight, heat, cold, and noise, and the pain occasionally wakes Plaintiff from his sleep. (R. 100, 101, 104, 108, 116). Plaintiff testified that when he experiences a severe headache, he becomes angry, frustrated, and irritable around others, and needs to isolate himself. (R. 117-18).

In discounting Plaintiff's statements, the ALJ first noted that they were not supported by objective evidence, which showed a history of "sporadic, routine, and conservative headache treatment." (R. 22). The Court finds no error in this assessment. The first available treatment note is from August 1, 2013, when Plaintiff went to the Parkland emergency department ("ED") in Texas complaining of an intermittent right temporal headache lasting 2 weeks, and swelling to the head. (R. 443, 445). Plaintiff described the pain as sharp and aching at a level of 7/10, with intermittent dizziness, blurred vision, and photosensitivity, but no nausea or vomiting. Though Plaintiff told the doctor "I feel like my head is fracturing on th[e right] side," he ultimately left the ED without being seen. (R. 444-45, 448).

More than a year later, on September 14, 2014, Plaintiff was admitted to St. Margaret Mercy North in Indiana for generalized muscle aches and chest pain after working out strenuously for three days. (R. 456). Plaintiff denied having headaches at the time of admission but did complain of headaches over the next couple of days. (R. 504, 509). Given Plaintiff's history of a gunshot wound to the head, his mother requested a CT scan on September 16, 2014, which came back normal (aside from confirming the presence of encephalomalacia). (R. 509, 523-24). At the time of his discharge on September 17, 2014, Plaintiff's headaches had responded to Toradol. (R. 22, 509). Shortly thereafter, in November and December 2014, Plaintiff filed his applications for disability.

On January 7, 2015, Plaintiff started seeing internist Kara Davis, M.D. He reported having severe bilateral temporal headaches several times a week that were throbbing, piercing, and stabbing, with associated photophobia. (R. 632). Dr. Davis prescribed Imitrex and instructed Plaintiff to return in one month. (R. 634). Two weeks later, on January 21, 2015, Plaintiff returned to the St. Margaret Mercy North ED due to a headache lasting 3 days. Plaintiff complained of pressure behind the eyes, occasional dizziness, and some photophobia, but no vision changes, nausea or vomiting. He said he took Imitrex, which had helped with previous headaches, but it did not provide any relief. (R. 529, 530). After a couple of hours, the pain had resolved and Plaintiff was discharged. (R. 533).[4] When Plaintiff followed up with Dr. Davis on January 27, 2015, he reported that the Imitrex did not alleviate his headaches and asked for a neurology referral. (R. 629). Dr. Davis provided the referral and added Tylenol to Plaintiff's

---

[4]     The record does not reflect that Plaintiff received any medication or other treatment for his headache prior to discharge. (R. 529-33).

8

medication regimen. (R. 631). At a follow-up appointment on February 16, 2015, Plaintiff reiterated that the Imitrex was not helping so Dr. Davis prescribed amitriptyline. (R. 626, 628). Plaintiff also reported that he had found a neurologist who took his insurance. (R. 626).

There is no record of Plaintiff being examined by a neurologist, but on July 25, 2015 he had an EEG and CT scan of the brain. The EEG test was essentially normal. (R. 566). The CT scan confirmed the presence of encephalomalacia in the region of Plaintiff's gunshot wound, but revealed no acute findings or abnormal enhancement. (R. 568). Four months later, on November 17, 2015, Plaintiff saw Dr. Davis and reported a good response to amitriptyline for his headaches. (R. 623). Dr. Davis refilled the prescription and once again indicated that she was referring Plaintiff to a neurologist. (R. 625). When Plaintiff saw Dr. Davis again on March 30, 2016 for another medication refill, he did not make any specific complaints about headaches. (R. 620, 621-23). On May 23, 2016, Plaintiff told Dr. Davis that he was struggling with headaches again but was not taking any medication for them at that time. (R. 617). Dr. Davis prescribed topiramate and instructed Plaintiff to return on June 27, 2016. (R. 619-20). Instead, Plaintiff next saw Dr. Davis on September 1, 2016, primarily due to his hypertension. (R. 614). Dr. Davis's note reflects that Plaintiff was still taking topiramate. (R. 616).

Plaintiff did not receive any further treatment for more than a year until September 22, 2017, when he was admitted to the ED due to a temporal and occipital headache lasting two days. (R. 675, 825). Plaintiff reported taking Tylenol that morning with little relief, and also acknowledged that he was supposed to take Imitrex but was not compliant because the medication makes him sleepy. (R. 825). Plaintiff described the pain as

constant, sharp and stabbing, at a level of 6/10. (R. 826). A CT scan of the head taken on September 23, 2017 showed no significant change from the September 16, 2014 study. (R. 830). Plaintiff's headache ultimately improved to a level of 2/10 and he was discharged on September 23 with an unspecified prescription ("Rx") and instructions to follow up with his primary care physician. (R. 831).

Five months later, on February 26, 2018, Plaintiff started treating with internist Solomon Okai, M.D. Plaintiff reported having "frequent or severe headaches" but no loss of consciousness or weakness. (R. 894). Based on Plaintiff's statements, Dr. Okai diagnosed chronic migraine without aura, intractable, without status migrainosus, and referred Plaintiff to a neurologist. (R. 894-95). On March 2, 2018, Plaintiff told neurologist Jeffrey Yu, M.D., that he has suffered from headaches for 27 years but the pain was more constant now at a level of 10/10. (R. 902). Plaintiff described the pain as "pounding and throbbing every day all day making him want to lie down," and said he does not like Imitrex or amitriptyline. (*Id.*). He also endorsed photosensitivity, phonosensitivity, dizziness, and eye blurriness, though no nausea or vomiting. (*Id.*). Dr. Yu assessed longstanding headaches "now debilitating because . . . it[']s more constant than off and on." (R. 904). He prescribed Inderal and propranolol, told Plaintiff to get a CT scan of the brain, and instructed him to follow up in 2-3 months. (*Id.*). The last available headache-related record is from March 7, 2018, when Plaintiff saw Dr. Okai seeking a referral for the CT scan. (R. 890).

Plaintiff does not explain how these records, which show that he went for long stretches without needing treatment, support his claims of disabling daily headache pain since September 2013. *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012)

(citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record."). Though Plaintiff claims his headaches are so disruptive that he needs to isolate himself and lie down several days per week, he failed to pursue treatment with a neurologist until March 2018, three years after he received the referral in January 2015. (R. 22, 626, 631, 902). In addition, the evidence reflects that Plaintiff's headaches responded to medications, including Toradol, Imitrex, and amitriptyline. (R. 22).

Plaintiff denies that his medications are effective, stressing the one occasion in January 2015 when he presented to the ED with a headache that had lasted for 3 days and was not helped by Imitrex. (R. 529). In Plaintiff's view, this incident demonstrates that his medications only provided temporary relief. (Doc. 14, at 15). The flaw in this argument is that Dr. Davis subsequently prescribed amitriptyline in February 2015, and Plaintiff reported a good response to the new medication in November 2015. (R. 623, 628). Plaintiff's headaches returned in May 2016, but only because he had stopped taking his medication. (R. 22, 617). Dr. Davis prescribed topiramate and Plaintiff went more than a year without needing further headache treatment. (R. 613). A headache did send Plaintiff to the ED in September 2017, but only because he once again was not taking his medication. (R. 825). *See Brenda L. v. Saul*, 392 F. Supp. 3d 858, 870 (N.D. Ill. 2019) ("The ALJ may deem an individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed.").

Plaintiff insists the ALJ should have considered his reasons for not taking his medications before drawing an adverse inference against him. (Doc. 14, at 14; Doc. 26,

at 11-12) (citing *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)).  The ALJ did just that, acknowledging Plaintiff's testimony that his medications cause drowsiness, that he cannot take many medications because he has kidney problems, and that he "did not like" Imitrex and amitriptyline.[5]  (R. 21, 22, 902).  Despite this, Plaintiff was able to go for long stretches without receiving headache treatment.  And as the ALJ noted, Plaintiff's doctors gave him new medications in response to his complaints.  (R. 22).  Plaintiff did not claim to have any problems with topiramate and he was able to go more than a year without treatment while using it between May 2016 and September 2017.  Most recently, Dr. Yu prescribed propranolol and Inderal, and "nothing in the record suggests these medications have not alleviated [Plaintiff's] headaches."  (R. 22, 904).  *See Shauger*, 675 F.3d at 696 ("[A] history of sporadic treatment . . . can undermine a claimant's credibility.").

Rather than address this evidence, Plaintiff argues that the ALJ needed to make a specific finding as to how frequently his headaches occur, as opposed to simply rejecting his testimony on that point.  (Doc. 14, at 6; Doc. 26, at 5).  The cases Plaintiff cites for this proposition are distinguishable and in no way demonstrate that the ALJ's decision to discount Plaintiff's testimony was patently wrong.  In *Boiles v. Barnhart*, 395 F.3d 421 (7th Cir. 2005), for example, the ALJ erred in rejecting medical opinions that the plaintiff's pseudoseizures met Listing 11.02, which required in relevant part that they occurred "more frequently than once a month."  *Id.* at 425.  In *Indoranto v. Barnhart*, 374 F.3d 470 (7th Cir. 2004), the ALJ ignored evidence that the plaintiff suffered from headaches and blurred vision and failed to explain why he omitted those conditions in determining the plaintiff's RFC.  *Id.* at 473-74.  And in *Cox v. Colvin*, No. 1:14-CV-01393-SEB-TAB, 2015

---

[5]     At the October 10, 2017 hearing, Plaintiff also expressed concern about taking Tylenol with codeine due to its addictive properties.  (R. 107).

WL 5022907, at *6 (S.D. Ind. Aug. 24, 2015), the ALJ improperly rejected the plaintiff's many reports of excruciating daily headaches based on a single treatment record indicating that the plaintiff was alert and not in distress. *Id.* at *6.

Here, the ALJ fully acknowledged and addressed Plaintiff's stated headache symptoms and provided several valid reasons for discounting them, including his history of sporadic, conservative treatment and his good response to medications. Contrary to Plaintiff's assertion, the ALJ did not improperly reject his testimony based on normal imaging studies. (Doc. 14, at 7; Doc. 26, at 3-4) (citing *Washington v. Colvin*, No. 12 C 4995, 2013 WL 1903247, at *11 (N.D. Ill. May 7, 2013) ("[D]iagnostic testing cannot necessarily reveal the frequency or severity of migraines.")). The ALJ did note that imaging studies showed encephalomalacia with no other acute findings (R. 22), but she did not cite that as a basis for discrediting Plaintiff's statements regarding the frequency and severity of his headaches.

Also unavailing is Plaintiff's objection that the ALJ committed reversible error by discounting the severity of his headaches based on: (1) his admitted ability to play basketball, move furniture, help a friend cut wood with a saw, and lift a garage door; and (2) his mother's testimony that he could lift heavy objects, install shades/blinds, and assemble furniture for her. (R. 22, 24). "[I]t is proper for the ALJ to consider a claimant's activities of daily living in assessing [the limiting effects of his symptoms] because inconsistencies between activities of daily living and the claimant's self-reported limitations may suggest that a claimant's testimony regarding h[is] symptoms are exaggerated." *Hackel v. Colvin*, No. 14 C 1429, 2016 WL 707020, at *15 (E.D. Wis. Feb. 22, 2016). Plaintiff insists there is nothing inconsistent about his being able to do these

activities on occasion, while still suffering from debilitating headaches at times. Yet Plaintiff testified that his headaches are triggered by moving too fast, which is inconsistent with his ability to play basketball and engage in strenuous physical activity. (R. 100).

Even assuming this aspect of the ALJ's decision was flawed, any error in that regard was harmless because the ALJ provided several other legitimate reasons for discounting Plaintiff's testimony. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (reaffirming that harmless error doctrine applies to social security cases); *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)).

In light of this conclusion, there is no merit to Plaintiff's objection that the RFC fails to account for his claimed need to isolate and lie down to alleviate pain. An RFC assessment need only incorporate limitations that are supported by the record. *See Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Since the ALJ reasonably rejected Plaintiff's testimony on this point, there was no need to include associated restrictions in the RFC. Plaintiff fails to explain how the limitations the ALJ did impose, including avoiding concentrated exposure to extreme cold and extreme heat, working in a moderate noise environment, never working in high exposed places, never driving motor vehicles in the performance of his job duties, never working outside, and never meeting fast-paced, high

production demands, are inadequate to accommodate his headache-related limitations that are supported by the record. (R. 20).

"As the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek*, 139 S. Ct. at 1154). Viewing the evidence as a whole, the ALJ did not commit reversible error in assessing Plaintiff's headaches, and Plaintiff's request for remand on that basis is denied.

### 2. Mental RFC

Plaintiff next argues the case must be remanded because the ALJ erred in assessing his mental RFC. A claimant's RFC is the maximum work that he can perform despite any limitations. See 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). The ALJ found that Plaintiff has moderate limitations in concentration, persistence, or pace ("CPP"), but retains the ability to: perform simple, routine, repetitive tasks; understand, remember, and carry out simple instructions; adapt to occasional changes in the work setting; never interact with the public; and never meet fast-paced, high production demands (i.e., assembly line work) but meet production rate pace in a shift. (R. 19, 20).

In reaching this conclusion, the ALJ gave great weight to the opinions from State agency psychological consultants Howard Tin, Psy.D. and Richard Zaloudek, M.D, and

consultative examiner Priyush C. Buch, M.D. (R. 24). On June 19, 2015, Dr. Tin opined that despite Plaintiff's moderate limitations in CPP, he can: understand, remember and carry out short and simple instructions; perform simple tasks; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 154-56). Dr. Tin limited Plaintiff to unskilled work tasks that do not require interaction with the public. (R. 156).

Dr. Zaloudek affirmed these findings on October 21, 2015, but in lieu of a limitation to unskilled work, he found Plaintiff capable of performing simple one- to three-step tasks that do not require tight quotas or timelines. (R. 197-99). Dr. Zaloudek further indicated that more than occasional, routine changes in the work setting would likely aggravate Plaintiff's headache pain and depression. (R. 198). In an opinion on June 10, 2015, Dr. Buch similarly concluded that Plaintiff can "understand, remember, and carry out instructions," and noted that he related well during the exam and demonstrated appropriate behavior. (R. 24, 557-58).

The ALJ explained that all of these opinions are consistent with the medical records showing that Plaintiff's mental status examinations "overwhelmingly yielded unremarkable findings" from May 2014 through March 2018. (R. 24). Specifically, Plaintiff was routinely cooperative, alert, and oriented, with normal mood, affect, speech, behavior, memory, insight, judgment, thought content, abstract thinking, intelligence, and general knowledge. (R. 23, 24, 482, 531, 533, 558, 616, 622, 627, 783, 828, 891). In

addition, Plaintiff testified at the October 10, 2017 hearing that he has never sought or received mental health treatment, and that no physician ever recommended that he do so. (R. 22, 114). Consistent with that testimony, the record contains no evidence of any mental health treatment of any kind.

Plaintiff ignores all of this medical evidence and instead focuses on Seventh Circuit case law indicating that limitations in CPP generally are not captured by a restriction to simple, routine work. (Doc. 14, at 8-9) (citing *Winsted v. Berryhill*, 923 F.3d 472, 476-77 (7th Cir. 2019) ("We have . . . made clear that in most cases employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area."); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis."); *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn to do tasks of a given complexity."); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)).

In making this argument, Plaintiff disregards other Seventh Circuit precedent stating that "an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings [of moderate limitations in CPP] into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (no error where the ALJ relied on medical opinion that despite the plaintiff's moderate limitations in CPP, she had the "ability to understand, remember and carry out simple instructions subject to physical limitations," "maintaining concentration and attention should be manageable," and she

"should be able to withstand routine work stress and adapt to typical job site changes."). *See also Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (mental RFC limiting the plaintiff to unskilled work involving simple, routine, and repetitive tasks with no fast-paced production line or tandem tasks, only occasional changes in work setting, and only occasional contact with public, coworkers, and supervisors supported by substantial evidence where ALJ relied on medical expert's testimony to assess the plaintiff's limitations and craft a mental RFC); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019).

Here, Drs. Tin and Zaloudek both opined that notwithstanding Plaintiff's moderate limitations in CPP, he can maintain sufficient attention and concentration to perform simple tasks, as well as carry out, understand, and remember short simple instructions. (R. 156, 198-99). Both physicians also limited Plaintiff to no interaction with the public, and Dr. Zaloudek added that he cannot handle "tight quotas and timelines" or more than occasional changes in the work setting. (R. 156, 198-99). The ALJ adopted all of these specific limitations in the RFC and in the hypothetical questions posed to the VE. (R. 20, 140). Since Plaintiff never received mental health treatment, there is no evidence to support any greater functional limitations.

Plaintiff argues that the RFC is still flawed because the ALJ found him incapable of "fast-paced, high production demands" without defining that phrase. (Doc. 14, at 9) (citing *Varga*, 794 F.3d at 815)) (absent a definition for "fast paced production," the VE could not assess whether a person with the plaintiff's anxiety and depression could maintain the pace proposed). To the contrary, the ALJ explained that "fast-paced, high production demands" means "assembly line work." (R. 20). The ALJ also clarified that

Plaintiff "is able to meet production rate pace in a shift." (*Id.*). Unlike in *Varga*, the VE indicated he understood this limitation, explaining that it would preclude an individual from performing Plaintiff's past relevant construction work because those jobs "require you to maintain a certain pace during the course of the day." (R. 140-41). Moreover, the only evidence Plaintiff cites to support his assertion that he cannot meet even production rate pace is his own testimony (and testimony from his mother) that as a result of his headaches, he gets irritable and needs to isolate himself and go lie down several days per week. For reasons discussed earlier, the ALJ reasonably rejected this testimony, finding it unsupported by medical and other evidence of record.

Plaintiff next argues that since the ALJ asked the VE about off-task time, she should have incorporated that discussion into her analysis. (Doc. 14, at 11; Doc. 26, at 11) (citing *Winsted*, 923 F.3d at 477). Plaintiff notes the VE's testimony that being off-task in excess of 15% of the workday is work-preclusive, and says he would be off-task at least that often. (R. 141-43). Once again, the only evidence Plaintiff cites for this proposition is his own rejected testimony, and testimony from his mother, that he needs to isolate himself and lie down several times per week when he gets headaches. No physician of record indicated that Plaintiff would be off-task for even 15% of the workday, much less some greater amount of time.

Plaintiff insists that the case also requires remand because the ALJ erred in failing to adopt Dr. Zaloudek's limitation to one- to three-step tasks despite giving his opinion great weight. Yet the ALJ also gave great weight to Dr. Tin's opinion that Plaintiff is capable of performing unskilled work, and incorporated that precise restriction into the RFC. (R. 24). Unlike Dr. Zaloudek, Dr. Tin did not include a one- to three-step task

restriction. Plaintiff does not acknowledge Dr. Tin's assessment or explain why the ALJ erred in giving it great weight. Nor does Plaintiff address the fact that the ALJ adopted findings from both Drs. Tin and Zaloudek that Plaintiff is capable of performing "simple tasks." (R. 20, 156, 199). In such circumstances, including Plaintiff's complete lack of mental health treatment, any error the ALJ may have made in failing to articulate why she did not adopt a one- to three-step restriction is at most harmless.

The ALJ likewise did not commit reversible error by failing to incorporate another aspect of Dr. Zaloudek's opinion into the RFC, namely, that Plaintiff has moderate difficulties remembering and carrying out detailed instructions. The ALJ expressly limited Plaintiff to understanding, remembering, and carrying out *simple* instructions, and included this restriction in the hypothetical questions posed to the VE. (R. 20, 140). Plaintiff does not identify any other moderate limitations that the ALJ purportedly omitted from the RFC. (R. 20) (restricting Plaintiff to occasional changes in the work setting, no interaction with the public, and no fast-paced, high production demands due to moderate limitations in those areas). *Compare Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019) (ALJ erred in omitting the plaintiff's moderate limitations in multiple functional categories, including the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods); *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) (limitation to unskilled work with no fast-paced production line or tandem tasks insufficient to account for moderate limitations in: performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions

from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods).

Plaintiff insists that both omissions from the RFC were harmful because the jobs the VE identified as being available to him have a reasoning level of 2 (kitchen helper and counter supply) or 3 (linen room attendant). Plaintiff says these reasoning levels are incompatible with a limitation to one- to three-step tasks with moderate difficulties in remembering and carrying out detailed instructions. (Doc. 14, at 12-13; Doc. 26, at 7-8). In other words, Plaintiff believes that had the VE been confronted with these additional restrictions in the hypothetical questions, the VE would not have identified the kitchen helper, counter supply and linen room attendant jobs as being available.

The Dictionary of Occupational Titles ("DOT") assigns each job a General Educational Development ("GED") score, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 946 (N.D. Ind. 2012) (quoting Dep't of Labor, *Dictionary of Occupational Titles*, Appendix C(III), 1991 WL 688702). The GED scale is comprised of three divisions – reasoning development, mathematical development, and language development – and each division is divided into 6 levels. *Id.* For jobs with a reasoning development level of two, a claimant must be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* To perform reasoning development level 3 jobs, a claimant must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized

situations." (Dep't of Labor, *Dictionary of Occupational Titles*, Appendix C(III), 1991 WL 688702; https://occupationalinfo.org/appendxc_1.html, last visited April 7, 2021).

As several courts have observed, the "DOT and Social Security regulations . . . use markedly different standards for addressing a claimant's ability to understand, remember, and concentrate on job duties." *Eggleston v. Colvin*, No. 13 C 5208, 2015 WL 2208221, at *5 (N.D. Ill. May 7, 2015) (citing *McCain v. Colvin*, No. 12 C 9652, 2013 WL 6283638, at *7 (N.D. Ill. Dec. 4, 2013)). "The regulations divide such abilities into only two categories – 'short and simple instructions' and 'detailed' or 'complex' ones – whereas the DOT uses a more graduated scale ranging from one to six that does not easily accommodate itself to the regulations' simple/complex dichotomy." *Stile v. Colvin*, No. 14 C 4379, 2017 WL 2908783, at *8 (N.D. Ill. July 7, 2017) (quoting *Thompkins v. Astrue*, No. 09 C 1339, 2010 WL 5071193, at *10 (N.D. Ill. Dec. 6, 2010)).

Plaintiff does not address this case law or provide evidence to refute the fact that "a task may be 'simple' under the regulations and still involve the kind of 'detailed' tasks required under Level 2 reasoning." *McCain*, 2013 WL 6283638, at *7 ("[N]o one-to-one parallel can be found between 'simple' as it is used under the regulations and the DOT's requirements."); *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *4 (N.D. Ill. Feb. 4, 2019) ("'[S]imple work restrictions . . . are not necessarily inconsistent with Reasoning Level 2 occupations."). Nor does Plaintiff explain how a "simple" task under the regulations differs from a one- to three-step task, or why it would not be compatible with reasoning level 2 and 3 jobs in the circumstances of this case. Notably, the Seventh Circuit has indicated that "even workers who are markedly limited in their ability to understand, remember, and follow detailed instructions might still be able to perform jobs

requiring level 3 reasoning development," such as the linen room attendant job. *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013) (emphasis added). *See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (claimant with the cognitive capacity to follow simple instructions could perform jobs with a reasoning level of three). On the record presented, the Court finds no error in the ALJ's reliance on the VE's testimony that Plaintiff can perform reasoning level two and three jobs such as kitchen helper, counter supply, and linen room attendant.

In a footnote, Plaintiff faults the ALJ for failing to include any limitations on his ability to interact with coworkers and supervisors, and only restricting his interaction with the public. (Doc. 14, at 14 n.3). In support, Plaintiff notes that Dr. Zaloudek found he has moderate limitations in the ability to work near others without being distracted by them. (R. 183). Yet Dr. Zaloudek (and Dr. Tin) also found Plaintiff not significantly limited in the ability to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 168, 184). Plaintiff does not address these findings or explain how they demonstrate that the ALJ should have limited his interactions with coworkers and supervisors in the RFC.

Viewing the record as a whole, the ALJ did not err in assessing Plaintiff's mental RFC and the case need not be remanded for further consideration of that issue.

### 3. Knee Pain

Plaintiff's final argument, once again raised in a footnote, is that the ALJ failed to properly consider his knee pain in determining his RFC. (Doc. 14, at 8 n.2). This is a nonstarter. Plaintiff complained to Dr. Davis of knee pain in January 2015 but he exhibited

23

normal movement in all his extremities at that time. (R. 632, 633). Though Dr. Davis referred Plaintiff for physical therapy, there is no evidence he pursued that or any other treatment. More than three years later, in February 2018, Plaintiff mentioned knee pain to Dr. Okai, who sent him for x-rays. Those March 28, 2018 imaging studies showed only mild osteoarthritis in the right knee and no abnormalities in the left knee. (R. 920). The ALJ acknowledged Plaintiff's knee pain but reasonably concluded it was not a severe impairment. (R. 17-18).

Plaintiff does not dispute the step 2 severity finding but claims his knee pain, "coupled with his severe headaches and adjustment disorder, would cause him to lose focus on tasks throughout the workday." (Doc. 14, at 8 n.2). Given that Plaintiff only mentioned knee pain twice in more than 3 years, and received no treatment for it, there is no merit to Plaintiff's assertion that the condition has any bearing on his ability to concentrate when considered along with his other impairments. This is particularly true since the ALJ reasonably rejected Plaintiff's testimony about the limiting effects of his headaches, and Plaintiff never received any treatment for his adjustment disorder. The ALJ stated that she "considered the combined effects of the severe and non-severe impairments in assessing [Plaintiff's] functional capacity," and the Court finds no error in this aspect of the ALJ's decision. (R. 18). Plaintiff's request that the case be remanded for further consideration of his knee pain is denied.

## CONCLUSION

For reasons stated above, Plaintiff's request to reverse the ALJ's decision is denied, and the Commissioner's Motion for Summary Judgment [21] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: April 7, 2021

_____

SHEILA FINNEGAN
United States Magistrate Judge